## EKSTROM v. UNITED STATES.

### No. J–24.

Court of Claims.

Dec. 6, 1937.

George M. Morris, of Washington, D. C. (Morris, KixMiller & Baar, of Washington, D. C., on the brief), for plaintiff.

John W. Blalock, of Washington, D. C., and James W. Morris, Asst. Atty. Gen. (Robert N. Anderson, Fred K. Dyar, and Elizabeth B. Davis, all of Washington, D. C., on the brief), for the United States.

Before BOOTH, Chief Justice, and GREEN, LITTLETON, WILLIAMS, and WHALEY, Judges.

GREEN, Judge.

This is an action to recover with interest the sum of $54,451.90 paid by the Mechanics Machine Company as manufacturers' excise taxes under section 900 of the Revenue Act of 1921 (42 Stat. 291) and section 600 of the Revenue Act of 1924 (43 Stat. 322). The Mechanics Machine Company from January 1921, until its dissolution, was an Illinois corporation engaged in the manufacture and sale of transmissions and parts therefor, also universal joints and parts therefor. On June 30, 1928, the directors and stockholders of the Mechanics Machine Company voted to dissolve the corporation. At the same time they turned over all of the corporate assets, including the claims herein involved, to Eric S. Ekstrom, who was then president of the company, in order that he might dispose of the assets, pay the corporate debts, and distribute the balance to the company's stockholders. After that date the company did no business and its charter was forfeited on September 24, 1930, by the State of Illinois. Ekstrom remained liquidating trustee until his death on January 12, 1936. Prior to that time he had paid all the corporate debts and completed all of his assignment except that which pertained to the collection and distribution of the claims involved in this suit. His widow and administratrix, Grace M. Ekstrom, was substituted as party plaintiff herein by order of this court dated August 17, 1936.

Refund claims covering payments made for taxes on sales during the years 1921 to 1926, inclusive, were duly filed. All of the claims were rejected except the claim filed on April 4, 1925, for a refund of $4,933.60. This claim was allowed in the sum of $4,876.03 with interest.

Within two years after the rejection of the other refund claims, the original petition was filed on January 23, 1928.

It appears that the Machine Company made and sold universal joints and a mechanism called the "Jumbo" transmission together with attachments for connecting these several mechanisms with other machinery and paid taxes on the sales thereof as shown in the findings. One issue in the case is as to whether these sales were properly taxable. The defendant also alleges that the party now prosecuting the action is not entitled to maintain it and that the plaintiff has been guilty of laches.

A "universal joint" is a flexible coupling permitting motion at varying angles while transmitting power from a driving member to a driven member. It is a matter of common knowledge that all automobiles make use of universal joints in transmitting the power from the engine to the wheels—usually the rear wheels—the line of the engine shaft being at an angle with the shaft connecting with the differential which operates in giving motion to the wheels. The principle employed in the universal joints is very old and known since the tenth century. For many years prior to the advent of the automobile they had been used in numerous mechanisms and at the time the taxes involved were levied were made and sold by the Machine Company and other manufacturers in commercial quantities to be used on a great variety of machines, a number of which are listed in finding 7. The joints here involved are the seven standard sizes of universal joints made by the Mechanics Machine Company. These standard joints differed from each other only in weight and capacity, were all of the same design, and all designed to be used as a coupling between two shafts operating at different angles from one another in any kind of machinery requiring such a transmission of power. They were not specially designed for use in automobile mechanisms as it required no special design for such use, and

they were equally adapted for use in other mechanisms as well as for use in automobiles. The extremities of universal joints necessarily were made to fit the extremities of the machinery with which they were to be connected but the same type of fittings employed by automobiles was also used for connections with other machinery. In this connection it should be noted that joints specially made for automobile manufacturers and sold to them are not involved herein. No taxes were paid on these joints. They were sold under tax exemption certificates, the tax being paid by the automobile manufacturer when they became part of the car. No changes in the universal joints on which the plaintiff paid the tax were required to make them operate satisfactorily in mechanisms not used for automobile purposes and they could be used interchangeably without alteration in assembling machinery in either case. Under familiar rules the sales of universal joints were not taxable.

The other matter in controversy relates to taxes levied upon sales of what are called "Jumbo" transmissions.

These transmissions were made by the Machine Company for the Price-Hollister Company, a sales company which bought the entire output of the Machine Company.

The term "transmission," as used in this case, means a set of gears operating between a driving shaft and a driven shaft either for the purpose of increasing or decreasing the speed of the revolutions of a shaft or reversing the rotary movement thereof. At the time the Jumbo transmission was designed the Ford Model T power plant was being extensively used as a stationary engine furnishing power for a number of purposes not connected with an automobile. The Price-Hollister Company concluded that there would be an active demand for a transmission to be attached to the planetary transmission of the Model T motor in such form as to supply the demand for a sturdy flexible unit that would increase the number of uses of the Model T Ford engine especially as a stationary power plant. At that time there were thousands of Ford Model T engines which were lying unutilized in storage in various parts of the country. The design of the Jumbo transmission facilitated the use of these unused Ford engines as stationary engines and also increased the use of any Ford truck or automobile into which the transmission was built, by converting it into a power unit which could readily be moved from one stand to another.

The Jumbo transmission was composed of a transmission case, or housing, and eight gears, four of them being mounted integral. The drive gear, two sliding gears, and the idler gear were directly above the integral gears. There was an opening in the side of the transmission case through which power could be taken by meshing with the idler gear a gear of the correct pitch, mounted on a shaft. This opening was called the "power take-off" opening, and made it possible by methods known to any ordinary mechanic to divert power from the Ford Model T internal combustion engine to wherever it was required. By meshing proper-sized gears with the idler gear in the transmission, any amount of torque required could be delivered out of the power take-off openings.

This transmission was sold by the Price-Hollister Company not only to car dealers and machine shops, but also to retail merchants, garages, and makers of machines not used for automobile purposes for use on a great variety of machines listed in finding 10.

The statute makes sales of "parts" or "accessories" of automobiles taxable but does not define these terms. For an explanation of their meaning we must look to the regulations.

The Supreme Court has given a definition of what constitutes a part or accessory to an automobile in Universal Battery Co. v. United States, 281 U.S. 580, 583, 50 S. Ct. 422, 423, 74 L.Ed. 1051, wherein it is said: "The administrative regulations issued under section 900 uniformly have construed the term 'part' in that section as meaning any article designed or manufactured for the special purpose of being used as, or to replace, a component part of such vehicle, and which by reason of some characteristic is not such a commercial article as ordinarily would be sold for general use, but is primarily adapted for use as a component part of such vehicle. The regulations also have construed the term 'accessory' as meaning any article designed to be used in connection with such vehicle to add to its utility or ornamentation and which is primarily adapted for such use, whether or not essential to the operation of the vehicle." These regulations were approved.

It seems to have been considered by the Commissioner of Internal Revenue and

argued on behalf of defendant that because the Jumbo transmission was primarily designed and adapted for use in connection with the Ford Model T engine and was in fact used in some instances as a part of a car or truck, it follows that the transmission was an automobile part and taxable as such. That this is not enough is apparent on reading the regulation; see, also, Milwaukee Motor Products, Inc. v. United States, 66 Ct.Cl. 295, 302. In order to make the part taxable it must, under the regulations, be designed for the *special purpose* of being used as, or to replace, a component part of a self-moving vehicle and be such an article as would not ordinarily be sold for general use, but be *primarily adapted* for use as a component part of such vehicle. This description cannot be applied to the Jumbo transmission as will be seen when we consider later its construction, adaptation, and use.

The regulations further provide [Regulations 47 (Revised), Article 14] that: "Any article which has reached a state of manufacture wherein it is in itself a component part or accessory and is of such a nature that it may be used or attached by an ordinary repair man or individual user as distinguished from a manufacturer or producer is subject to tax as a 'part or accessory.'" Here again we shall find on examination that this regulation excludes the Jumbo transmission.

The findings show that the Jumbo transmission could not be installed in an automobile or truck by an ordinary repair man or individual user, but on the contrary required a highly skilled mechanic to make a number of precision operations, fittings, alterations, and changes in the chassis of the car, all of which necessarily would require considerable expense. In fact, it could not be used in an automobile as originally constructed. Under the regulations the transmission under consideration would not be taxable because it could not be fitted into an automobile by an ordinary repair man. This same fact, we think, shows that it could not have been designed for the "special purpose" of being used as a component part of an automobile and (in connection with the other facts) also shows that this transmission was not primarily adapted for use as a component part of an automobile.

When the transmission was installed in a car, the purchaser acquired a new transmission in addition to the one already therein. Whether the result was an improvement in operating the car is not disclosed, but considering the total expense in the cost of the transmission with installation and the fact that there was already a transmission in the car which was workable and practical, it would seem that there would be little demand for the Jumbo transmission merely to have a different kind with which to operate the car, that when so used it was more for the purpose of obtaining a portable power plant than for any added convenience in operating the automobile, and that it was so designed. Be this as it may, when there were thousands of Model T Ford engines lying detached in all parts of the country, it is quite plain that the principal demand for the transmission would be for use in connection with these detached engines as a stationary power plant. For this purpose they were not merely equally adapted, but far better adapted than for use as a part of the car for automotive purposes. In this connection it will be noted that it required only slight mechanical skill to connect the transmission with an engine separate from the car in such a manner that it could be used as a power plant. Most farmers who have the skill needed for making the necessary adjustments in farm machinery would be able to make the attachment.

The evidence shows that the Jumbo transmissions were sold with certain attachments when they were ordered or the manufacturer had reason to believe they were to be used for a particular purpose. There were three kinds of these attachments, one kind apparently being used when the transmission was to be made a part of the car. The defendant contends that when so sold, the transmission with attachments being intended for use in an automobile, it became a taxable accessory or part and that as there is nothing to show how many were so sold there can be no recovery in the case. We do not think this follows. The evidence does not show just what these attachments were, but whatever they were they did not do away with the necessity for the precision operations that we have described above or the alterations and changes necessary to be made in the chassis of the car. The evidence shows that the transmission itself was a unit, was equally adaptable for many other purposes, and was so used. If the purchaser chose to add some other attachments, we do not think it alters the situation so far as the taxability is concerned. Moreover, the

evidence does not show what these attachments were or the particular purpose which they served, but it does appear that even when they were furnished the precision operations and alterations and changes in the chassis, to which we have before referred, had to be made by a skilled mechanic and could not be accomplished by an ordinary repair man. In other words, the purchaser had to adapt the car to the transmission before it could be used and even when it was installed it seems probable that his primary purpose in so doing was rather to obtain a portable power plant than to improve the operation of the automobile.

We think that when the regulations are applied to the facts in the case it clearly appears that the sales of the Jumbo transmissions were not taxable.

■ As a special defense in the case it is contended on behalf of the defendant that no right of action existed on behalf of Eric S. Ekstrom as trustee for the stockholders of the Mechanics Machine Company and that even if such right did exist the present plaintiff was improperly substituted by this court and the petition should be dismissed.

The theory advanced by defendant is that after the dissolution of the corporation all pending litigation was abated. This is contrary to our decision in the case of Oberndorfer v. United States, 65 Ct.Cl. 376, and also contrary to a number of Illinois decisions holding that where a corporation has brought suit within the two-year period prescribed by the statute for winding up its business it may be prosecuted to judgment after the expiration thereof. In support of the argument of defendant, the case of Oklahoma Natural Gas Co. v. Oklahoma, 273 U.S. 257, 47 S. Ct. 391, 392, 71 L.Ed. 634, is cited, but we do not think it is applicable. It is said in the opinion with reference to statutory authority for the prolongation of the period: "The matter is really not procedural or controlled by the rules of the court in which the litigation pends. It concerns the fundamental law of the corporation enacted by the state which brought the corporation into being."

The defendant, however, concedes that the Illinois law is as above stated. Rev. St. § 955 (28 U.S.C.A. § 778) provides that when a party to any suit dies pending final judgment and the cause of action survives at law, the executor or administrator may prosecute the suit to final judgment, and

the Supreme Court said in Baltimore & Ohio R. Co. v. Joy, Adm'r, 173 U.S. 226, 229, 19 S.Ct. 387, 389, 43 L.Ed. 677: "Whether a pending action may be revived upon the death of either party, and proceed to judgment, depends primarily upon the laws of the jurisdiction in which the action was commenced. If an action be brought in a federal court, and is based upon some act of congress, or arises under some rule of general law recognized in the courts of the Union, the question of revivor will depend upon the statutes of the United States relating to that subject."

Under the rule laid down above it is clear that Mrs. Ekstrom is the party to continue the present action.

■ We also think that the court acted in pursuance of the general rule that a court of equity will not permit a trust to fail for want of a trustee, and by permitting the wife to continue the suit in effect treated her as a successor to her husband in the trusteeship. It may be conceded that under the common law and the Illinois law a trustee successor to Mrs. Ekstrom could have otherwise been appointed to maintain this action. But no successor was appointed. If Mrs. Ekstrom be not allowed to continue this action and it is dismissed the trust will fail, although it is conceded that Mrs. Ekstrom now has title to the trust property. It is true that the successor in title to trust property may not be qualified or be a proper party to administer the trust, and in such cases a court of equity will displace such a trustee with one selected by the court; but it is also the rule that the court may in some circumstances refuse to appoint a substitute and in Bogert on Trusts (1935 Edition) § 529, p. 1679, we find the following: "Where, for instance, the only remaining duty is to distribute the trust property among the beneficiaries according to a prescribed schedule, no special qualifications are required for the task, and hence no appointment [of a new trustee] will be made."

Perry on Trusts (7th Ed.) § 344, p. 586, goes farther and shows that the executors will take the trust property and while they are not obliged to execute the trust they may do so. The same work is authority for the rule that the executor or administrator of a trustee may continue an action, which is supported by numerous authorities. When this court recognized the right of the administratrix of the trustee to continue the suit, it merely carried out the

principles of equity and justice following its former decision.

■ Laches in the application for the substitution of the present plaintiff in the place of the original trustee is also set up as a defense. We think it is a sufficient answer to say that the defendant has in no way been prejudiced thereby and that by proper action on its own part the proceedings could have been hastened.

Our conclusion is that the plaintiff is entitled to maintain the action and to recover with interest the amount of taxes in controversy erroneously collected in accordance with this opinion and the findings of fact. Judgment will be suspended awaiting a stipulation of the parties as to the amount due in accordance with the opinion of the court, or if the parties cannot agree they may file their respective computations and the court will determine the amount. An equated date may be used as the date from which interest will run if the parties so agree.